UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

VICTOR E. VALDERRAMA, JR.,

        **Plaintiff,**

   -against-

COMMISSIONER OF SOCIAL SECURITY,

        **Defendant.**

**22-CV-8287 (ALC)**

<u>**OPINION & ORDER**</u>

**ANDREW L. CARTER, JR., United States District Judge:**

  Plaintiff Victor E. Valderrama, Jr. ("Plaintiff," "Claimant," or " Mr. Valderrama")

proceeding *pro se*, brings this action challenging the Acting Commissioner of Social Security's

("Commissioner" or "Defendant") final decision that Plaintiff was neither disabled nor entitled to

Supplemental Security Income ("SSI") benefits under Title XVI of the Social Security Act, 42

U.S.C. §§ 401 *et seq*. Pending before the Court is Defendant's motion for judgment on the

pleadings pursuant to Fed. R. Civ. P. 12(c). For the reasons stated below, Defendant's motion is

**GRANTED**.

BACKGROUND

**I.  Procedural Background**

  On April 9, 2014, Mr. Valderrama filed an application for SSI benefits under Title XVI of

the Social Security Act. R. at 150-55.[1]  He alleged an onset date of disability on September 11,

2005. *Id.* Plaintiff's claim was initially denied on August 8, 2014. *Id.* at 75. On September 8,

---

[1] "R." refers to the Certified Administrative Record prepared by the Social Security Administration. ECF No. 11.
Pagination follows original pagination in the Certified Administrative Record.

2014, Plaintiff filed a written request for a hearing before an Administrative Law Judge ("ALJ"). *Id.* at 77.

On December 19, 2016, ALJ Romeo held an in-person hearing. *Id.* at 36. Mr. Valderrama appeared and testified at the hearing represented by his attorney, Michael D. Schoffman. *Id.* An impartial Vocational Expert ("VE"), Edna Clark, also appeared and testified by telephone. *Id.* at 39, 55-64.

On January 11, 2017, ALJ Romeo issued a decision finding that Mr. Valderrama was not disabled under Section 1614(a)(3)(A) of the Social Security Act, and therefore should not be entitled to SSI benefits. *Id.* at 15-35. On February 13, 2017, Mr. Valderrama filed a request to the Appeals Council for review of this decision. *Id.* at 5. The Appeals Council denied this request on September 15, 2017. *Id.* at 1. This rendered the ALJ's decision the final decision of the Commissioner. *Id.*

On October 4, 2017, Plaintiff timely commenced an action in federal district court, under 42 U.S.C. §§ 405(g) and 1383(c)(3), seeking judicial review of the Commissioner's decision. *Id.* at 595. On March 29, 2019, the Court granted Plaintiff's motion for judgment on the pleadings and denied the Commissioner's cross-motion. *Id.* at 603.

The Court remanded the case back to the ALJ with the following instructions:

(1) supplement and further develop the record as necessary (e.g., to identify the bases of Dr. Weidershine's July 2016 opinion);

(2) reconsider Dr. Weidershine's opinion with proper deference owed a treating source and in context of the entire record; and

(3) if appropriate, to explain with specificity the ALJ's consideration of the factors set forth

in *Halloran*, 362 F.3d at 32, to justify any decision not to give substantial weight to Dr.

Weidershine's opinion as Plaintiff's treating psychiatrist.

*Id.* at 602-03. The case was then reassigned to ALJ Jason A. Miller. *Id.* at 539.

On February 12, 2020, ALJ Miller held an in-person hearing. *Id.* at 564. Mr. Valderrama

appeared and testified at the hearing represented by his attorney, Michael D. Schoffman. *Id.* An

impartial VE, Robert Lasky, also appeared and testified by telephone. *Id.* at 584-90.

On March 6, 2020, ALJ Miller issued a decision finding that Mr. Valderrama was not

disabled, under Section 1614(a)(3)(A) of the Social Security Act. *Id.* at 536-55. On July 28,

2022, the Appeals Council denied Plaintiff's request for review. *Id.* at 526. This rendered the

ALJ's decision the final decision of the Commissioner. *Id.*

On January 3, 2023, Plaintiff filed this civil action. On March 3, 2023, Defendant filed a

Motion for judgment on the pleadings, pursuant to Fed. R. Civ P. 12(c), and submitted a

memorandum of law in support of her motion ("Def. Mot."). Def. Mot. EFC. No. 13, 1-25.[2]

## II.    Factual Background

Mr. Valderrama was born on July 30, 1967. R. at 207. He was 38 years old at the onset of the

alleged disability on September 11, 2005. *Id.* Mr. Valderrama was 46 years old when he filed his

application for SSI benefits, on April 9, 2014. *Id.* at 150, 207. He was 49 years old at the time of

the December 16, 2016, hearing, and 52 years old at the February 12, 2020, hearing. *Id.* at 36-65,

207, 562-93.

---

[2] "Def. Mot." refers to the Memorandum of Law in Support of Defendant's motion for Judgment on the Pleadings.
ECF No. 13. Pagination follows original pagination in the Memorandum.

Mr. Valderrama has completed a high school education. *Id.* at 42, 212. His education stopped in 1989, after one year and a half of college. *Id.* at 42, 572. Mr. Valderrama has a history of drug abuse, homelessness, and unemployment. *Id.* at 207-09, 312, 336, 393, 547, 591. He received public assistance, medical assistance, and Supplemental Nutritional Assistance Program benefits. *Id.* at 22.

Mr. Valderrama has held a few jobs between the onset of his alleged disability on September 11, 2005, and the February 12, 2020, hearing. *Id.* at 203-05. In 2011, Mr. Valderrama worked as a foot messenger, for approximately nine months. *Id.* He claimed to be let go because of arguments with his coworkers. *Id.* Around 2015, Mr. Valderrama worked as a hot walker for four or five months, walking horses around. *Id.* at 43, 57-58. He claimed to be terminated for failing to list his prior convictions when applying. *Id.* at 43. Mr. Valderrama routinely lifted approximately ten pounds as a foot messenger and hotwalker. *Id.* at 58-59.

 In 2018, Mr. Valderrama worked, for two days, as a Citi Field garbage collector. *Id.* at 573-74. He claimed this work was too strenuous for his back. *Id.*

Before Mr. Valderrama's claimed onset of his disability, he worked in sales, for a year, at a jewelry store in Puerto Rico. *Id.* at 294, 585-86. In 2001, he worked as a construction worker for approximately one to two months, and as security for a clothing store for about nine months. *Id.* at 45.

Mr. Valderrama alleges his disability stems from his mental impairments and chronic lower back pain caused by a fall in 2008 and a motor vehicle accident in 2014. *Id.* at 220-32, 211. He claims he cannot sit, stand, or walk for prolonged periods; lift or carry heavy objects; and properly socialize or work long hours. *Id.* at 220-32, 221. Mr. Valderrama has also been

medically diagnosed with, or symptomatic of, depression, major depression disorder, bipolar disorder, acid reflux, gastritis, hiatal hernia, and an impairment of the spine. *Id.* at 211, 627-28.

### a. Non-Medical Evidence

### i. Disability Report

On June 4, 2014, Claimant submitted a disability report. *Id.* at 209. It listed that he had depression, major depressive disorder, bipolar disorder, acid reflux, and back problems and that he took medications: Famotidine, Fluoxetine, Gabapentin, Pantoprazole, Seroquel, and Xanax. *Id.* at 211, 213.

### ii. Mr. Valderrama's Testimony

On February 12, 2020, Mr. Valderrama testified with a cane, at the hearing before ALJ Miller. *Id.* at 569, 571-72. He testified that he used the cane when his back locked, or when he felt pain in his leg or back. *Id.* at 572.

Mr. Valderrama testified that his back problem was the main reason he could not work. *Id.* at 574. He stated his back problems prevent him from lifting more than ten pounds and worsen in rainy or extremely cold weather. *Id.* at 575. Mr. Valderrama testified that regarding his back problems, he does not take pain medication. *Id.*  Nor does he see a doctor regularly for his back "because of insurance problems." *Id.* But, stated his methadone treatment helped relieve his pain. *Id.*

Mr. Valderrama also testified that his mental conditions were a partial reason he could not work. *Id.* at 574. He stated he had major depression, bipolar disorder, and "situations with authority." *Id.* To manage these conditions, Mr. Valderrama testified to taking Ambien, Abilify,

Xanax, hydroxyzine, and Wellbutrin. *Id.* at 577. He stated these medications had side effects of dizziness, lightheadedness, and sexual difficulties. *Id.* at 577. He also testified that the medications improved his mental status, but at times made him feel "the same." *Id.* at 578. Mr. Valderrama stated he struggled with focusing at times. *Id.* at 591-92.

Mr. Valderrama testified he lived alone in an apartment and was awarded visitation rights with his youngest son. *Id.* at 578-89. He stated since living alone, he no longer experiences panic attacks. *Id.* at 591. Mr. Valderrama explained that he does his laundry, commutes on the train, can cook for himself, and socializes with his son and fiancé. *Id.* at 583. He also testified he attends a methadone program, Housing Works, and is prescribed 70 milligrams of methadone. *Id.* at 580. He stated he had not used any illegal substance, specifically heroin, in the last two years. *Id.* at 581.

### iii. Vocational Expert's Testimonial Evidence

On February 12, 2020, VE Lasky testified by phone, at the hearing before ALJ Miller. *Id.* at 585. He testified that Mr. Valderrama's previous work as a foot messenger was unskilled, had a light exertional level, and a Specific Vocational Preparation ("SVP") of 2. *Id.* An SVP is the amount of time required for a typical claimant to "[l]earn the techniques, [a]cquire the information, and [d]evelop the facility needed for average performance in a job." Social Security Administration Program Operation Manual System DI 25001.001A.77, available at https://secure.ssa.gov/apps10/poms.nsf/lnx/0425001001#a77 (visited June 25, 2024).

VE Lasky further testified that a hypothetical individual of Mr. Valderrama's age, education level, work experience, and Residual Functional Capacity ("RFC") could work at three jobs, according to the Dictionary of Occupational Titles ("DOT"). *Id.* at DI 25001.001A.67; R. at

586-90.[3] The three positions identified were a photocopy machine operator, mail room clerk, and price marker. R. at 587. These were all unskilled positions, with a light exertion level, and an SVP of 2. *Id.*

This hypothetical individual could only lift or carry ten pounds occasionally, but five pounds frequently. *Id.* at 586-90. They walk with a cane and occasionally climb ladders, ropes, or scaffolds; crouch or crawl; and tolerate exposure to moving mechanical parts and extreme cold. *Id.* Their mental limitations were, a restriction to understanding, remembering, and carrying out short, simple instructions; and avoiding all contact with the general public. *Id.* This individual is also limited physically to sit or stand, with normal breaks, for six hours per eight-hour workday. *Id.* at 586.

VE Lasky also testified that there were three additional jobs this hypothetical individual could work based on Mr. Valderrama's testimony at the hearing. *Id.* The three positions identified in the DOT were a sorter, assembler, and finisher. *Id.* at 589. This hypothetical individual had all the limitations as the other, aside from walking with a cane. *Id.* at 588. In addition, they were the age of Mr. Valderrama when he filed his application for SSI benefits; could only lift or carry ten pounds occasionally, but five pounds frequently; and stand or walk for two hours per eight-hour workday. *Id.*

### b. Physical Health Medical Evidence

### i. Dr. Kayur Shah, M.D.

---

[3] Residual Functional Capacity is "[a]n administrative assessment of a claimant's maximum remaining capacity for work on a sustained basis." Social Security Administration Program Operation Manual System DI 25001.001A.77, available at Social Security Administration Program Operation Manual System DI 25001.001A.67, available at https://secure.ssa.gov/apps10/poms.nsf/lnx/0425001001#a67

On May 5, 2014, Claimant was treated by Dr. Kayur Shah, M.D. *Id.* at 282. Claimant complained of epigastric pain, gas, heartburn, and bloating over the last month. *Id.* Dr. Shah noted Claimant's history of acid reflux, large hiatal hernia, and antral gastritis. *Id.* He also noted Claimant reportedly only gets relief for his symptoms from Nexium but is taking Prilosec because "insurance does not want to pay for it." *Id.* Dr. Shah found Mr. Valderrama should have an esophagogastroduodenoscopy. *Id.* at 283.

### ii. Dr. Vincent Notar-Francesco M.D.

On June 4, 2014, Dr. Vincent Notar-Francesco, M.D. performed an esophagogastroduodenoscopy. *Id.* at 290. Dr. Notar-Francesco found Claimant had "mild gastritis" and a "hiatus hernia in the GE junction." *Id.* Dr. Notar-Francesco concluded, Claimant should continue his current medication and follow up with an endoscopist in two weeks. *Id.*

### iii. Dr. Robert Greco, M.D.

On July 25, 2014, a radiology report performed by Robert Greco, M.D., found Claimant had mild spondylosis. *Id.* at 297. Claimant had no fractures or subluxation in his spine. *Id.*

### iv. Dr. Chitoor Govindaraj, M.D.

On July 30, 2014, Dr. Chitoor Govindaraj, M.D., performed a consultative examination on Claimant. *Id.* at 291-96. He noted Claimant "presents low back pain." *Id.* at 297. Dr. Govindaraj examined Claimant's spine and found no tenderness and the "[r]ange of motion within normal limits." *Id.* at 296. He also found Claimant's back and joints to have a normal range of motion. *Id.* Dr. Govindaraj opined Claimant had no restrictions from sitting, standing, walking or any weight lifting, and his "[o]verall medical prognosis [was] good." *Id.*

### v. Dr. Chaim Shtock, D.O.

On August 18, 2016, Chaim Shtock, D.O., performed a consultative orthopedic examination on Claimant. *Id.* at 488. Claimant complained of back, and lower back, pain that is aggravated by excessive bending, heavy lifting, and prolonged walking. *Id.* Dr. Shtock noted that Claimant had been seeing a medical doctor at the onset of his back pain but had no history of treatment. *Id.* He also noted Claimant had previously been diagnosed with disc herniation and occasional low back pain. *Id.*

Dr. Shtock opined that Claimant had limitations in heavy lifting, squatting, and frequent bending; mild to moderate limitations in kneeling, frequent stair climbing, walking long distances, and standing and sitting for long periods; and mild limitations in crouching, but no limitations performing overhead activities with both hands and using his hands for fine or gross motor activities. *Id.* at 491. He also indicated Claimant can continuously lift up to 10 pounds, carry up to ten pounds, and continuously reach. *Id.* at 494. Claimant could also frequently: climb stairs and ramps, climb ladders or scaffolds, balance, stoop, kneel, crouch, and crawl. *Id.* at 495. And, Claimant can be exposed to: the moderate noise level of an office, moving mechanical parts, operate a motor vehicle; and the sorting, handling, and using of papers or files. *Id.* at 496.

### v. Dr. Ram Ravi, M.D.

On August 20, 2016, Ram Ravi, M.D., performed a consultative internal medicine examination on Claimant. *Id.* at 507. Claimant complained of back pain, acid reflux, hypertension, enlarged heart, and seizures. *Id.* He reported that these symptoms limited his daily activities, such as showering and cleaning. *Id.* at 508. Claimant reported he was asymptomatic for seizures after being treated by a neurologist.

Dr. Ravi observed that "[b]ased on the examination," Claimant, "has no limitations standing or sitting . . . [and] mild limitations to walking, bending, pushing, pulling, lifting, carrying, and overhead activities," but he should "avoid activities requiring mild or greater exertion due to his cardiac condition." *Id.* at 510. Dr. Ravi opined, Claimant should avoid driving, operating machinery, heights, and uneven surfaces due to his history of seizures. *Id.*

### vi. Dr. Narayan B. Paruchuri, M.D.

On July 8, 2016, Narayan B. Paruchuri, M.D. conducted an MRI Lumbar Spine on Claimant. *Id.* at 522-25. It revealed no abnormalities in the Claimant's spine. *Id.*

### vii. Dr. Jason Yu, M.D.

On July 18, 2016, Jason Yu, M.D., requested an MRI of Claimant's spine. *Id.* at 522. Dr. Yu found that Claimant had "no evidence of significant spondylolisthesis." *Id.* However, it revealed disc herniations that caused a left foraminal impingement, and a disc bulge resulting in left lateral recess stenosis. *Id.* at 522-25, 546.

### v. Dr. Lakhbir Dhillon, M.D.

On January 30, 2019, Claimant saw his primary care provider Lakhbir Dhillon, M.D. *Id.* at 758-90. Claimant complained of tingling and numbness in his right arm and hand for the past few weeks. *Id.*

### vi. Dr. Lyudmila Trimba, M.D.

On August 12, 2019, Dr. Lyudmila Trimba, M.D. performed an orthopedic consultative exam on Claimant. *Id.* at 1483-92. Claimant reported to Dr. Trimba that he was able to cook once a week, do laundry once a month, and go shopping as needed. *Id.* Claimant's physical

examination revealed normal findings regarding general appearance, gait, and station. *Id.* He had full motor strength, no muscle atrophy, no sensory abnormality, and physiologic and equal reflexes. On examination of his bilateral upper and lower extremities. *Id.* Straight leg raise testing was negative bilaterally in both the supine and sitting positions. *Id.*

### c. Mental Health Medical Evidence

### i. Dr. E. Gagan

On August 1, 2014, Dr. E. Gagan, M.D., a state agency psychiatric consultant reviewed Claimant's medical file. *Id.* at 66-74, 553. Dr. Gagan opined that Claimant's spine disorders and substance addiction disorders were severe, but his affective disorders were non-severe. *Id.* at 70. He noted Claimant had no limitations in understanding, memory, or social interaction. *Id.* Dr. Gagan reported Claimant was moderately limited in carrying out detailed instructions, maintaining attention and concentration for extended periods, performing activities punctually, adapting appropriately, and being aware of normal hazards and taking appropriate precautions. *Id.* at 70-72. Claimant was not significantly limited in sustaining an ordinary routine without special supervision, working in coordination with others without distraction, making simple work-related decisions, setting realistic goals or planning independently, and using public transportation. *Id.* at 71-72.

Dr. Gagan determined Claimant was not significantly limited in "[t]he ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods." *Id.* at 72.

### ii. Dr. Douglass Bass, M.D. & Ms. Nancy Gryka, RN

On January 10, 2014, Claimant was medically evaluated by Dr. Douglass Bass, M.D., and Nancy Gryka, RN, for detoxification services at New York Psychotherapy and Counseling Center ("NYPCC"). *Id.* at 276-79. RN Gryka found Claimant qualified for "ambulatory medically-supervised withdrawal services." *Id.* at 278. She concluded Claimant suffered from either moderate or mild alcohol or substance withdrawal. *Id.* RN Gryka also noted under Claimant's mental status evaluation, that he was "well-groomed," "cooperative," had an "appropriate" affect, "normal" speech, and "intact" thoughts. *Id.* at 277.

### iii. Dr. Brickell Quarles, Ph.D.

On July 19, 2014, Dr. Brickell Quarles, Ph.D. performed a consultative psychiatric examination on Claimant. *Id.* at 287-90. Dr. Quarles reported Claimant's mental status as calm, cooperative, and easy to engage with. *Id.* at 288. He found Claimant to be limited in concentration, short-term memory, and intellectual function but to have fair judgment. *Id.* 289-90. But mildly limited with memory. *Id.*

Claimant reported to Dr. Quarles that he started taking drugs young and last used heroin in June 2014. *Id.* at 288. Claimant also stated he had a history of being incarcerated from 1996 to 1998 for selling drugs. *Id.* Claimant denied having a history of psychiatric hospitalization. *Id.* Claimant also reported to Dr. Quarles he smokes marijuana occasionally to help him calm down and he is prescribed to: Xanax, Prozac, Neurontin, Seroquel, and Ambien. *Id.* Claimant reported to Dr. Quarles of having friends, enjoying sports, movies, music, reading, and dancing. *Id.* at 289.

Dr. Quarles diagnosed Claimant with bipolar disorder, heroin dependence, and cannabis abuse. *Id.* at 289. He determined Claimant had mood swings that could be medically managed.

*Id.* at 290. But Dr. Quarles concluded, Claimant should "participate in individual psychotherapy, psychiatric medication management and drug treatment" to improve his vocational capacity. *Id.* at 289-90. He noted Claimant was seeing a psychiatrist once a month, and a therapist, once a week, at the Methadone maintenance program, Narco Freedom. *Id.* at 289.

### iv. Ms. Kerry Ledden, LCSW

On September 3, 2015, Kerry Ledden, a licensed clinical social worker ("LCSW"), admitted Claimant after evaluating him in a preadmission screening. *Id.* 305. LCSW Ledden determined, Claimant should be admitted to: "stabilize mood, work towards refraining from drug use, develop coping skills, develop self-awareness, improve judgement, improve self-esteem and learn to appropriately externalize anger." *Id.*, 439.

### v. Ms. Helen Boynowsky, LCSW

On September 5, 2015, LCSW Helen Boynowsky evaluated Claimant. *Id.* at 440. She noted Claimant's mental health problems included: symptoms of bipolar disorder, depression, mood swings, struggles with drug use, stress due to the custody battle of his son, and sometimes Claimant heard voices to hurt others but did not act upon it. *Id.* She also noted, Claimant had a history of violence but had "not engaged in violent behaviors for around 2 years." *Id.* at 468, 472. LCSW Boynowsky opined Claimant's mental health strengths of being verbal and irritable. *Id.* at 440. She recommended treatment to improve Claimant's mood, coping skills, self-awareness, and to decrease his depression and anxiety. *Id.* at 444. LCSW Boynowsky's prognosis of Claimant was "fair with treatment." *Id.* at 467.

### vii. Ms. Lorena Orozco, MSW

In 2015 and 2016, Claimant was counseled by Lorena Orozco, a Master of Social Work ("MSW"). Claimant reported to her he had trouble controlling his symptoms because of child custody, housing, and familial obligation issues. *Id.* at 325, 327-31, 337-38, 340-41. On January 19, 2016, Claimant was granted visitation of his son for the first time. *Id.* at 343. He reported to MSW Orozco, it was "the best thing that happened to him." *Id.*

On April 4, 2016, Claimant reported to MSW Orozco that he had trouble controlling his symptoms because of financial pressures from his girlfriend. *Id.* at 393. But he also reported his medication was helping him control these symptoms. *Id.* On April 11, 2016, Claimant stated compliance with medication and counseling sessions were improving his mood. *Id.* at 395. He reported attending his Methadone program, going to physical therapy and pain management for his back, and actively solving his housing issues. *Id.*

On June 13, 2016, Claimant reported to MSW Orozco that issues with his girlfriend made him "feel very angry and frustrated." *Id.* at 419. MSW Orozco counseled Claimant on "coping skills to better deal with [his] current stressors." *Id.* He was receptive, open, and reacted well to the intervention. *Id.* On June 15, 2016, Claimant reported to MSW Orozco that he was struggling with his symptoms because of issues with his girlfriend and the death of his uncle. *Id.* at 415.

### viii. Lucy Kim, Psy.D.

On August 20, 2016, Lucy Kim, Psy.D., performed a psychological consultative examination on Claimant. *Id.* at 548, 499-506. Claimant reported to not using heroin in the previous five months but still using marijuana, three or four times a month. *Id.* He also reported to Dr. Kim that he was able to clean and do his own laundry, go shopping on his own, and take public transportation by himself. Dr. Kim found that Claimant's attention, concentration, and

recent remote memory, were mildly impaired due to distractibility. Dr. Kim diagnosed Claimant with major depressive disorder and bipolar disorder.

Dr. Kim noted the Claimant, "has never been hospitalized due to psychiatric reasons." *Id.* at 499. Claimant reported to Dr. Kim he did not experience, "anxiety symptomatology, panic attacks, manic symptomatology, thought disorder, and cognitive deficits." *Id.* at 500. And, "his current medications are helpful, though, in decreasing his psychological symptoms." *Id.* at 499-500.

Dr. Kim determined Claimant's prognosis was fair given his ability to engage in daily living activities well. *Id.* at 502. Dr. Kim opined that Claimant had mild limitations in maintaining attention and concentration. *Id.* at 501. However, "no evidence of limitations to" "[f]ollowing and understanding simple directions and instructions, performing simple tasks independently, being able to maintain a regular schedule, learning new tasks, performing complex tasks independently, making appropriate decisions, relating adequately with others, and appropriately dealing with stress." *Id.* at 501.

Dr. Kim recommended Claimant continue with his psychological and psychiatric treatments, as well as begin vocational training and rehabilitation. Dr. Kim opined Claimant's ability to "understand, remember, and carry out instructions," was not affected by his impairments. *Id.* at 503-04. And neither was his ability to "interact appropriately with supervision, co-workers, and the public, as well as respond to changes in the routine work setting." *Id.*

### x. Dr. Donn Weidershine, M.D.

On March 21, 2016, Mr. Valderrama saw his treating psychiatrist, Donn Weidershine, M.D., at New York Psychotherapy and Counseling Center *Id.* at 386. He reported to Dr. Weidershine that his current medication was not adequately controlling his symptoms. *Id.* Mr. Valderrama reported his prescribed Seroquel was making him groggy for the entire day, and he had to buy Xanax "off the street," to manage his symptoms. *Id.* He also reported: slight panic attacks once a week, "6/10" anxiety level, "5/10" mood swing level, "8/10" depression level, and no physical aggression that day. *Id.* Dr. Weidershine determined Mr. Valderrama was calm and coherent but tired. *Id.* He discontinued Seroquel and prescribed Mr. Valderrama: hydroxyzine 50 mg, oxcarbazepine 300 mg, Latuda 80 mg, Ambien 10 mg, and Xanax 2 mg. *Id.* at 386-87.

On May 16, 2016, Mr. Valderrama reported to Dr. Weidershine the following symptoms: slight panic attacks twice a week, "3/10" anxiety level, "6-7/10" mood swings level. "6-7/10" depression level, sleeping 6-7 hours, and his physical aggression was "100%" gone. *Id.* at 405. On June 13, 2016, Mr. Valderrama reported the same symptoms to Dr. Weidershine but his physical aggression was "100%" gone and he had slight panic attacks once a week. *Id.* at 416. He also reported full compliance with his prescribed medication with one side effect, "orthostatic hypotension." *Id.* Dr. Weidershine decreased Mr. Valderrama's dosage of Xanax and, continued all other medications and psychotherapy. *Id.*

On July 11, 2016, Mr. Valderrama reported to Dr. Weidershine the following symptoms: slight panic attacks once a week, "6/10" anxiety level, "5/10" mood swings level. "7/10" depression level, sleeping 6-7 hours but lighter, and his physical aggression was "100%" gone. *Id.* at 421. Dr. Weidershine noted that Claimant lost twenty-five pounds in six months and continues to lose weight. *Id.* Mr. Valderrama also reported one medication side effect that,

"orthostatic hypotension continues if he stands quickly." *Id.* Dr. Weidershine made no changes to his medications. *Id.*

On July 18, 2016, Dr. Weidershine submitted a letter to Mr. Valderrama's attorney, Mr. Schoffman, in place of a "Psychiatric Medical Report." *Id.* at 486. Dr. Weidershine opined that, Mr. Valderrama's "limited focus, heightened anxiety, panic attacks and low frustration tolerance would considerably impair his ability to function in a work setting." *Id.* at 487.

In October 2016, Claimant reported to Dr. Weidershine increased symptoms and stress due to his uncle's death and a custody battle. *Id.* at 993. His mental status exam showed normal speech, and logical and goal-directed thought processes. *Id.* at 994. Dr. Weidershine noted that Claimant's mood was depressed, his recent and remote memory and judgment and insight were fair, but he was easily distractible and had difficulty sustaining attention. *Id.* Dr. Weidershine indicated that Claimant was experiencing psychotic symptoms daily and adjusted his medications. *Id.* at 995-96.

On December 15, 2016, Dr. Weidershine prescribed Mr. Valderrama Xanax 4 mg and Seroquel 100 mg for anxiety; Abilify 20 mg for depression; and Ambien 10 mg for sleep. *Id.* at 520. He was also prescribed Methadone 80 mg for rehabilitation from a methadone clinic. *Id.*

In December 2016, Claimant reported to be doing better. *Id.* at 997. His panic attacks had decreased to thrice monthly, and he reported no physical aggression. *Id.* Claimant also reported full compliance with his medication regimen. *Id.* Dr. Weidershine noted that Plaintiff was in a "better mood," and continued his medications, noting that he would switch from Xanax to Klonopin in February 2017. *Id.* at 997.

### xi. Antoine Adam

On January 4, 2017, Claimant began seeing a new treating psychiatrist, Dr. Antoine

Adam, M.D. *Id.* at 548-9, 993-1274. Dr. Adam prescribed Claimant Seroquel 400 mg, Xanax 2

mg, Ambien 10 mg, oxcarbazepine 300 mg, and Abilify 30 mg. *Id.* From approximately January

2017 to March 2018, Dr. Adam reported Claimant had no side effects and all his symptoms were

adequately controlled by medications. *Id.*

### xii. Dr. Sheikh Hoque, M.D.

On November 17, 2018, Claimant began seeing a new treating psychiatrist, Dr. Sheikh

Hoque, M.D. Claimant complained to Dr. Hoque that he felt anxious most of the time and Xanax

was the only thing that helped. *Id.* at 549, 1993-1274. Dr. Hoque noted he could not rule out that

Claimant was potentially abusing benzodiazepine. *Id.* Claimant agreed to taper his prescribed

benzodiazepines, and Dr. Hoque discontinued Seroquel, Trileptal, and Wellbutrin. *Id.* Dr. Hoque

then determined Abilify was sufficient to control Claimant's mood and hypomanic symptoms.

*Id.*

On December 12, 2018, Claimant reported to Dr. Hoque he felt anxious and irritable. *Id.*

Claimant also reported that he continued to smoke cannabis every weekend. *Id.* Dr. Hoque

lowered Claimant's dosage of Xanax. *Id.* Claimant then reported feeling anxious, suspicious of

other people, hopeless, and having poor concentration. *Id.* However, Dr. Hoque noted that

Claimant was working as a maintenance worker at his Methadone treatment center. *Id.* Dr.

Hoque reported Claimant's mental status examination was within normal limits. *Id.*

On February 16, 2019, Claimant asked Dr. Hoque to increase his Xanax dosage. *Id.* Dr.

Hoque advised Claimant "that he was free to look for another psychiatrist who might be more

helpful for him." *Id.*

### xiii. Nurse Terrelonge

On April 9, 2019, Nurse Terrelonge saw Claimant after his down-titration of Klonopin and Ambien. *Id.* Claimant reported he did not have any side effects to his prescribed medications. *Id.* However, when Claimant's Ambien dosage had been decreased, he complained of additional insomnia on May 7, 2019. *Id.* In response, Claimant was given hydroxyzine. *Id.* Nurse Terrelonge reported that Claimant denied any side effects to medications, anxiety, depression, or any psychotic symptoms, while prescribed Xanax, Ambien, Abilify, and hydroxyzine. *Id.* On July 9, 2019, Claimant's prescriptions were not changed, and he reported no side effects and stated he was sleeping well at night. *Id.*

### xiv. Dr. Seth Sebold, Ph.D.

On September 14, 2019, Dr. Seth Sebold, Ph.D., performed a psychological consultative exam on Claimant. *Id.* at 1493-1502. Dr. Sebold opined Claimant was limited in his ability to interact appropriately with the public. *Id.* at 553. Claimant's mental status examination was mostly in the normal limits, but Dr. Sebold noted he had mildly impaired attention, concentration, and recent and remote memory. *Id.* at 553, 1493-1502.

Dr. Sebold diagnosed Claimant with bipolar disorder, anxiety disorder, and a history of substance abuse disorder. *Id.*

## LEGAL STANDARD

### I.   Standard of Review

A district court reviews the final decision of the SSA Commissioner under 42 U.S.C. §§ 405(g) and 1383(c)(3) to determine whether it was "supported by substantial evidence in the

record and was based on a correct legal standard." *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012) (quoting *Lamay v. Comm'r of Soc. Sec.*, 562 F.3d 503, 507 (2d Cir. 2009)). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)) (internal quotations marks omitted). Thus, a district court may only reject an ALJ's factual findings, adopted as the final decision of the Commissioner, "if a reasonable factfinder would *have to conclude otherwise*." *Brault v. Soc. Sec. Admin.*, 683 F.3d 443, 448 (2d Cir. 2012) (emphasis in original) (quoting *Warren v. Shalala*, 29 F.3d 1287, 1290 (8th Cir. 1994)).

A district court may not "substitute its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a *de novo* review." *Jones v. Sullivan*, 949 57, 59 (2d Cir. 1991) (internal citation and quotation marks omitted); *see also* 42 U.S.C. § 405(g) (on judicial review, "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive.").

The same standard as a motion to dismiss for failure to state a claim under Rule 12(b)(6) governs a Rule 12(c) motion for judgment on the pleadings. *McCracken v. Verisma Systems, Inc.*, 91 F.4th 600, 606 (2d Cir. 2024)). A Court "evaluate[s] a judgment on the pleadings to see whether the complaint fails to state a claim that is plausible on its face. In doing so, [it] draw[s] all reasonable inferences in the plaintiff's favor to assess whether a complaint's factual allegations plausibly give rise to an entitlement to relief." *Id.* (internal citation omitted).

As relevant to the present case, "[i]t is well established that the submissions of a *pro se* litigant must be construed liberally and interpreted to raise the strongest arguments that they *suggest*." *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (internal

quotations omitted) (emphasis in original); *id.* at 475 (quoting *Traguth v. Zuck*, 710 F.2d 90, 95 (2d Cir. 1983)) ("[I]mplicit in the right of self-representation is an obligation on the part of the court to make reasonable allowances to protect *pro se* litigants from inadvertent forfeiture of important rights based on their lack of training.").

## II.    Determining Disability

A claimant is disabled under Section 1614(a)(3)(A) of the SSA and 42 U.S.C. § 423(d)(1)(A) if they are unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 month." 42 U.S.C. § 423(d)(1)(A). For a claimant's physical or mental impairments to qualify under a disability, they must be "of such a severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(a).

A claimant's subjective "statement[s] as to pain or other symptoms shall not alone be conclusive of evidence of disability." 42 U.S.C. § 432(d)(5)(A). The ALJ will consider the claimant's statements, objective medical evidence in the record, and other evidence such as the claimant's daily activities, precipitating and aggravating factors, and the location, duration, frequency, and intensity of their pain or other symptoms. *See* 20 C.F.R. §§ 416.929(c)(2)-(3).

The ALJ is not bound by the opinion of a treating physician that is contradicted by substantial evidence—including that of a consultative physician. *Mongeur v. Heckler*, 722 F.2d 1033, 1039 (2d Cir. 1983); *see Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004); *Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002) (treating physician's opinion is not controlling when

contradicted "by other substantial evidence in the record."); *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008); *Estrella v. Berryhill*, 925 F.3d 90, 97 (2d Cir. 2019).

An ALJ who refuses to accord controlling weight to the opinion of a claimant's treating physician "must explicitly consider the following, nonexclusive, *Burgess* factors: (1) the frequen[cy], length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist." *Estrella*, 925 F.3d at 95-96 (internal quotations omitted) (quoting *Selian v. Astrue*, 708 F.3d 409, 418 (2d Cir. 2013) (per curiam) (citing *Burgess*, 537 F.3d at 129 (citing 20 C.F.R. § 404.1527(c)(2)))). The ALJ must also, "give good reasons in [its] notice of determination or decision for the weight [it gives the] treating source's [medical] opinions." *Holloran*, 362 F.3d at 32 (per curiam) (quoting 20 C.F.R. § 404.1527(c)(2)).

The Commissioner considers non-objective medical evidence in her determination when it is reasonably acceptable as consistent with the objective medical evidence and other evidence within the record. *See* 20 C.F.R. § 416.929(c). Factors the Commission will consider when deciding whether to include this evidence are: (1) daily activities; (2) location, duration, frequency, and intensity of pain or other symptoms; (3) precipitating and aggravating factors; (4) type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms; (5) treatment, other than medication, to relieve pain or other symptoms; (6) any measures used to relieve pain or other symptoms; and (7) other factors concerning your functional limitations and restrictions due to pain or other symptoms. *Id.*

I.    **The Social Security Administration's Five-Step Sequential Evaluation**

In evaluating disability claims, the SSA follows a five-step sequential process. C.F.R. § 404.1520 (a)(4).

(1) First, the ALJ must determine whether the claimant is currently engaged in "substantial gainful activity" ("SGA"), which is significant physical or mental activity that is done for pay or profit. 20 C.F.R. §§ 416.920(b), 416.972(a), 416.972(b). If the claimant is not engaged in SGA, the ALJ proceeds to the second step.

(2) Second, the ALJ must determine whether the claimant has a medical impairment, or combination of impairments, that is "severe," which means an impairment that significantly limits his physical or mental ability to work. 20 C.F.R. §§ 416.920(c), 416.922. If the claimant has a severe impairment or combination of impairments, the analysis proceeds to step three.

(3) Third, the ALJ must determine whether the claimant's impairment, or combination of impairments, is listed in 20 C.F.R. 404 Subpart P, Appendix 1, or medically equal to an impairment therein. 20 C.F.R. §§ 416.920(d), 416.926. If the claimant has such an impairment, the ALJ will determine he is *per se* disabled. *Selian v. Astrue,* 708 F.3d 409, 418 (2d Cir. 2013). If not, the ALJ's analysis will proceed to step four.

(4) Fourth, the ALJ must determine the claimant's residual functional capacity ("RFC"), and if he has the RFC to perform the requirements of claimant's past relevant work. 20 C.F.R. § 416.920(e). An RFC is a claimant's ability, despite limitations from his impairments, to engage in physical and mental work activities on a sustained basis. 20 C.F.R. § 404.1545(a)(1). If the ALJ determines the claimant is unable to do any of his past relevant work, the analysis proceeds to step five.

(5) Fifth, the ALJ must determine whether the claimant is able to do any other work
(considering his RFC, age, education, and work experience), that exists in significant
numbers in the national economy. 20 C.F.R. § 416.920(g).

"The claimant has the general burden of proving that he or she has a disability within the
meaning of the Act, *see*, *e.g.*, *Draegert v. Barnhart*, 311 F.3d at 472, and bears the burden of
proving his or her case at steps on through four." *Burgess*, 537 F.3d at 128 (internal quotations
omitted) (quoting *Butts v. Barnhart*, 388 F.3d 377, 383 (2d Cir. 2004). At step five, "the burden
shifts to the Commissioner to show that there [are] a significant number of jobs in the national
economy that [the claimant] could perform based on his residual functional capacity, age,
education, and prior vocational experience." *Butts*, 388 F.3d at 381 (citing 20 C.F.R. §
404.1560), *amended on reh'g*, 416 F.3d 101 (2d Cir. 2005); *see also* 20 C.F.R. §
404.1520(a)(4)(v).

## DISCUSSION

## I.    The ALJ's Decision

On March 6, 2020, the ALJ issued a decision finding that Plaintiff had not met his burden of
proof to show he was disabled as defined by the Social Security Act. R. at 536, 555; 20 C.F.R. §
416.920(g).

The ALJ found at step one, of the five-step sequential evaluation for Social Security
disability claims, that Plaintiff had not engaged in SGA from the date he filed his claim—April
9, 2014. R at 542.

At step two, the ALJ found that Plaintiff had the following severe impairments: degenerative
disc disease of the cervical spine, degenerative disc disease and spondylosis of the lumbar spine,

bipolar disorder, panic disorder, and marijuana and opioid use disorder. *Id.* He found these impairments resulted in vocationally significant limitations and have lasted at a severe level for a continuous period of more than twelve months. *Id.*; *see also* 20 C.F.R. § 416.909. The ALJ considered Claimant's MRI examinations, consultative examinations, psychiatric progress notes, and psychotherapy progress notes. R. at 542; *see id.* at 287-90, 300-485, 499-506, 1493-1502.

The ALJ also found that Claimant's alleged acid reflux as a part of his disability did not qualify as a severe impairment. *See* 20 C.F.R. 416.922; R. at 542, 211, 213. The ALJ considered Claimant's primary care records and found no evidence of "significant symptomatology as a result" of acid reflux. *Id.* at 542, 757-90. And, the ALJ considered that Claimant was prescribed appropriate medications for acid reflux. *Id.* at 542.

At step three, the ALJ found Claimant did not have an impairment, or combination of impairments, that were listed, or medically equal to, the severity of one of those listed in 20 C.F.R. Part 404, Subpart P, Appendix I. *Id.*; *see also* 20 C.F.R. §§ 416.920(d), 416.925, 416.926. The ALJ found that neither Claimant's spinal impairments nor his mental impairments met these criteria. R. at 543. The ALJ considered Claimant's August 20, 2019, physical examination which revealed he did not have the necessary neurological deficits within his lower extremities to rise to that level of severity. *Id.* at 543, 1483-92. He also considered psychological consultative examinations and mental status examinations from 2016 and 2019, as well as Claimant's 2020 testimony. *Id.* at 543-44. It revealed that Claimant had mildly impaired recent and remote memory; moderate limitations in interacting with others; moderate limitations in concentrating, persisting or maintaining pace; and mild limitations in adapting or managing himself. *Id.* at 2239, 270, 281, 499-506, 544, 566, 573, 1493-1502.

At step four, the ALJ found Plaintiff had no past relevant work. *Id.* at 544. Plaintiff had not performed work at the SGA level during the 15-year relevant period of the decision. *Id.* The ALJ also found the Plaintiff had the RFC "to perform a range of light work as defined in [20 C.F.R. § 416.967(b)]." *Id.* The ALJ stated:

> specifically, he can lift and/or carry 20 pounds occasionally, 10 pounds frequently. He can stand and/or walk, with normal breaks, for a total of six hours per eight-hour workday, and can sit, with normal breaks, for a total of six hours per eight-hour workday. Further, in terms of postural limitations, he can never climb ladders, ropes, or scaffolds, and can never crouch or crawl; but can occasionally climb ramps and stairs, and can occasionally balance, stoop, and kneel. In terms of environmental restrictions, he can never tolerate unprotected heights or vibrations; but can tolerate occasional exposure to moving mechanical parts or to extreme cold. Lastly, in terms of mental limitations, he is restricted to understand, remember, and carry out short, simple instructions, and he must avoid all contact with the general public.

*Id.*

At step five, the ALJ found three jobs Claimant could perform, that exist in significant numbers in the national economy, based on his RFC, age, education, and work experience. *Id.* at 554-55, 585-90. These jobs were photocopy machine operator, mailroom clerk, and price marker. *Id* at 555, 587. The ALJ considered the testimony of VE Lasky to reach this determination. *Id.* at 555, 585-90.

## II.    Assessment of the ALJ's Findings

Plaintiff alleges that the ALJ's decision was not supported by substantial evidence and/or was based on legal error. R. at 616. The Commissioner seeks the entry of judgment on the pleadings on the grounds that the ALJ's decision is supported by substantial evidence. *See generally*, Def. Mem. ECF No. 13. The Court finds that the ALJ's decision was supported by substantial evidence and based on correct legal standards.

26

**A. The ALJ's Determination that Plaintiff's Impairments and/or Combination of Impairments is Non-Severe is Supported by Substantial Evidence**

The Commissioner is responsible for the final determination of whether any of a claimant's impairments, (if severe), "meets or equals the requirements of any impairment(s) in the Listing of Impairments" in 20 C.F.R. 404 Subpart P, Appendix 1. 20 C.F.R. § 404.1527(d)(2); 20 C.F.R. § 404.1527(d)(1) ("[The Commissioner is] responsible for making the determination or decision about whether you meet the statutory definition of disability."). In making this determination, she will consider all relevant medical and other evidence within a claimant's case record. 20 C.F.R. § 404.1527(d). Neither a statement by a medical source nor a medical diagnosis of a disease or impairment is dispositive of this determination. *Id.*

Here, the ALJ found Claimant had the following severe impairments: degenerative disc disease of the cervical spine; degenerative disc disease and spondylosis of the lumbar spine; bipolar disorder; panic disorder; and marijuana and opioid use disorder. *Id.* at 542. However, he determined none of these impairments met or medically equated to the severity of those listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. *Id.*

For Claimant's physical impairments, the ALJ considered medical evidence to determine they did not meet the statutorily defined level of severity. *Id.* at 542. Claimant's impairments of the spine did not have the necessary neurological deficiencies, within his lower extremities, to meet this definition. *Id.* Claimant had negative straight leg raise testing bilaterally, both sitting and supine, as well as normal strength, sensation, and reflexes, in his bilateral upper and lower extremities. *Id.* at 542-43. To reach this conclusion, the ALJ considered Claimant's August 12, 2019, orthopedic consultative examination. *Id.*; *see* R. at 1483-92. The ALJ determined Claimant's physical impairments were not severe, as statutorily defined, by considering the

27

relevant medical evidence of the specific impairment. *Id.* at 542-43; *id.* at 1483-92. For this

reason, the ALJ's determination is supported by substantial evidence in the record. *See Rivers v.*

*Astrue*, 280 Fed. Appx. 20, 22 (2d Cir. 2008) (holding a diagnosis of impairment is, of itself, not

sufficient to render it severe); *see also Selian v. Astrue*, 708 F.3d 409 (2d Cir. 2013).

       The ALJ also found Claimant's mental impairments, singularly and in combination, did

not meet the statutorily defined level of severity of "Listings 12.04 (Depressive, bipolar and

related disorders) and 12.06 (Anxiety and obsessive-compulsive disorders). R. at 543. The ALJ

considered Claimant's psychiatric history, psychological consultative examinations, and

testimony. *Id.* at 543-44. For the Claimant's mental impairments to qualify as severe, they must

result in "one extreme limitation or two marked limitations in a broad area of functioning." *Id.* at

544. "An extreme limitation is the inability to function independently, appropriately, or

effectively, and on a sustained basis. A marked limitation is a seriously limited ability to function

independently, appropriately, or effectively, and on a sustained basis." *Id.* at 543.

       The ALJ considered Claimant's August 2016 and September 2019 psychological

consultative examination and January 2019 psychiatric progress notes. *Id.* This evidence

revealed Claimant only had mildly impaired recent and remote memory and a normal psychiatric

mental status finding. *Id. see id.* at 499-506, 993-1274, 1493-1502. Thus, the ALJ properly

determined that "the record as a whole does not support significant restrictions" of Claimant's

"understanding, remembering or applying information"—only mild. *See id.* at 543

       The ALJ also considered Claimant's testimony on February 12, 2020. *Id.*; *see id.* at 562-

93. Claimant stated he was getting along with his fiancée, seeing his son, taking public

transportation, engaging well in other daily activities such as laundry, going to a day treatment

program, and has friends but no social life. *See id.* at 543, 578-79, 583, 591. Claimant also stated

in psychiatric visits and consultative psychological exams, that he has no conflict with others in public places; and that his anger management problems were under control. *See id.* at 405, 421 543. Thus, the ALJ properly determined Claimant had a moderate limitation in adapting or managing himself. *See id.* at 543. Claimant's admissions of interactions with his son, fiancée, and strangers reasonably precluded the ALJ's finding of a marked or extreme limitation within that domain. *See id.* at 543.

The ALJ considered Claimant's statements to Nurse Terrelonge on June 4, 2019, July 9, 2019, and November 13, 2019. *Id.* Claimant only reported to being symptomatic when he was not compliant with his medications, or their dosage was reduced or removed, and reportedly denied side effects and symptoms of psychosis, anxiety, or depression otherwise. *Id.*; *see id.* at 549, 1993-1274. Claimant told her the medication kept him stable. *Id.* at 543, *see id.* at 573, 1993-1274. The ALJ also considered Claimant's August 2016 and September 2019 psychological consultative examinations. *Id.* at 543; *see id.* at 499-506, 1493-1502. These revealed Claimant's attention and concentration were mildly impaired due to distractibility or difficulty with math calculations. *See id.* at 499-506. The ALJ, weighing this evidence, determined Claimant had a moderate limitation in concentrating, persisting, or maintaining pace, and his other mental conditions were adequately maintained with medication. *Id.* at 543-44.

The ALJ considered Claimant testifying he lives by himself, attends treatment programs, helps his aunt with physical chores, does his own laundry, and takes public transportation by himself. *Id.* at 544; *see id.* at 582-83. Considering the entire record, the ALJ determined that Claimant had a mild limitation in adapting or managing himself. *Id.* at 544.

In sum, the ALJ determined none of Claimant's mental impairments cause two "marked limitations" or one "extreme limitation." *Id.* at 544. Thus, they are not severe as statutorily

defined. *Id.* Neither were Claimant's physical impairments. *Id.* at 542. To reach this determination the ALJ considered relevant medical and non-medical evidence that "a reasonable mind might accept as adequate to support" his conclusion. *See Talavera*, 697 F.3d at 151 (quoting *Lamay*, 562 F.3d at 507).

### B. The ALJ's RFC Determination is Supported by Substantial Evidence

RFC is "[a]n administrative assessment of a claimant's maximum remaining capacity for work on a sustained basis." Social Security Administration Program Operation Manual System DI 25001.001A.77, available at Social Security Administration Program Operation Manual System DI 25001.001A.67, available at https://secure.ssa.gov/apps10/poms.nsf/lnx/0425001001#a67. It is "the most [a claimant] can still do despite [their physical and mental] limitations." *See* 20 C.F.R. § 404.1545(a). An ALJ determines a claimant's RFC "based on all of the relevant medical and other evidence" within the claimant's case record. *Id.* "A statement by a medical source that [claimant is] 'disabled' or 'unable to work,'" is not the final determination of an ALJ. *See* C.F.R. § 404.1527(d)(2).

An ALJ who refuses to accord controlling weight to the opinion of a claimant's treating physician "must explicitly consider the following, nonexclusive, *Burgess* factors: (1) the frequen[cy], length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist." *Estrella*, 925 F.3d at 95-96 (internal quotations omitted) (quoting *Selian v. Astrue*, 708 F.3d 409, 418 (2d Cir. 2013) (per curiam) (citing *Burgess*, 537 F.3d at 129 (citing 20 C.F.R. § 404.1527(c)(2)))). The ALJ must also, "give good reasons in [its] notice of determination or decision for the weight [it gives the] treating source's

[medical] opinions." *Holloran*, 362 F.3d at 32 (per curiam) (quoting 20 C.F.R. §

404.1527(c)(2)).

Here, the ALJ found Claimant had the RFC to perform light work. *Id.* at 544. Claimant

> can lift and/or carry 20 pounds occasionally, 10 pounds frequently. He can stand and/or
> walk, with normal breaks, for a total of six hours per eight-hour workday, and can sit, with
> normal breaks, for a total of six hours per eight-hour workday. Further, in terms of postural
> limitations, he can never climb ladders, ropes, or scaffolds, and can never crouch or crawl;
> but can occasionally climb ramps and stairs, and can occasionally balance, stoop, and
> kneel. In terms of environmental restrictions, he can never tolerate unprotected heights or
> vibrations; but can tolerate occasional exposure to moving mechanical parts or to extreme
> cold. Lastly, in terms of mental limitations, he is restricted to understand, remember, and
> carry out short, simple instructions, and he must avoid all contact with the general public.

*Id.* In reaching this conclusion the ALJ considered the entire record and gave considerable

weight to consultative examiner Dr. Trimba's August 12, 2019, opinion and declined to give

controlling weight to the July 2016 opinion Dr. Weidershine, Claimant's treating physician. *Id.*

at 552-53, 594-604.

In July 2016, Dr. Weidershine opined that Claimant's, "limited focus, heightened anxiety,

panic attacks and low frustration tolerance would considerably impair his ability to function in a

work setting." *Id.* at 487. In August 2019, Dr. Trimba opined Claimant could perform light work

with additional postural and environmental limitations. R. at 553.

Applying the *Burgess* factors, the ALJ determined first, Dr. Weidershine saw Claimant

for a relatively brief and infrequent period—once a month, from March 21, 2016, to December 5,

2016. Second, Dr, Weidershine's opinion is based on symptoms beginning in 2009 and a list of

medications Claimant no longer takes. *Id.* at 552. Third, symptoms Dr. Weidershine noted such

as, struggling with memory, are not supported by other medical evidence in the record. *Id.* at

552-53. Fourth, Dr. Weidershine is a specialist in psychiatry. On balance, the ALJ properly

afforded Dr. Weidershine's medical opinion little weight for the purpose of this decision. *Id.* at 552-53.

The ALJ's RFC determination was supported by substantial evidence from Dr. Trimba's August 12, 2019, medical opinion and her physical examination of Claimant. She noted, Claimant "required no assistive device to ambulate, and no neurological deficits, and had negative leg raise testing." *Id.* at 553. Also, the ALJ's decision not to give Dr. Weidershine's opinion controlling weight, after applying the *Burgess* factors, was based on a correct legal standard. *Id.* at 552-53.

## CONCLUSION

Upon a thorough consideration of the evidence, the Court finds the Commissioner's final decision is supported by substantial evidence and based upon application of correct legal standards.

For the reasons stated above, the Commissioner's motion for judgment on the pleadings is **GRANTED**, and the ALJ's decision is **AFFIRMED**. The Clerk of the Court is respectfully directed to enter judgment and to close this case.

**SO ORDERED.**

**Dated:** August 21, 2024

      **New York, New York**
                                     **HON. ANDREW L. CARTER, JR.**
                                       **United States District Judge**